**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JOLI TORMEY, | Civil Action No: 3:15-cv-08208-PGS |
| *Plaintiff,* | |
| | **MEMORANDUM** |
| v. | **AND** |
| | **ORDER** |
| CAROLYN W. COLVIN, | |
| Acting Commissioner of SSA, | |
| *Defendant.* | |

**SHERIDAN, U.S.D.J.**

This matter is before the Court on the appeal of Plaintiff, Joli Tormey of the final decision of the Commissioner of Social Security denying her application for a period of disability and disability insurance benefits from September 10, 2010 through the date of the decision. On January 4, 2012, Plaintiff filed a Title II application for a period of disability and disability insurance benefits. (R. 11, 179) Plaintiff alleged disability beginning September 15, 2010 due to optic nerve damage, neck and knee injuries, depression, and anxiety. R. 199.

I.

Background

Plaintiff was born in 1967 and regularly worked as a tennis instructor for fifteen years. (R. 36). In 2006, she was in a car accident wherein Plaintiff's car was stopped, it was struck from behind by another vehicle. Plaintiff visited the emergency room and was diagnosed with acute neck strain. (R. 262).

Plaintiff reports that she is "in pain every single day." (R. 209). Plaintiff needs help combing her hair, but her injuries do not affect any other type of personal care. (R. 220). She

noted that, although her pain sometimes prevents her from doing so, she performs many activities, including driving, shopping, laundry, playing with her daughter, and using the computer. (R. 221-23). She alleges that her injuries affect other activities, such as her ability to lift, walk, climb stairs, see, and complete tasks. (R. 223-24). There is nothing in the report that her injuries affect the use of her hands (despite the option to check a box noting this). (R. 223). Plaintiff's mother filed a third-party function report affirming many of Plaintiff's statements. (R. 227-34).

Medical Records and Reports

The ALJ did not rely on the medical records from 2006 through 2011 because those records are from the time period before Plaintiff's application for Social Security Benefits, and many are from the time period before the alleged onset of Plaintiff's claimed disability. Plaintiff was treated by several doctors during these years, who diagnosed radiculopathy, noted reduced grip strength, and prescribed a variety of treatments, such as pain medicine and epidural injections. See, e.g., R. 282, 299, 350, 362. She was also treated for problems with her eyes, leading Martin Weinberg, M.D. to diagnose her with traumatic optic neuropathy. See R. 409.

The ALJ relied on the following medical reports from 2012 as these records are from the time period in question.

On January 10, 2012, Plaintiff was examined by Thomas J. Nordstrom, M.D. due to knee pain. (R. 414). On examination of her knees, Dr. Nordstrom found "bad patellofemoral crepitance," but stated "alignment is good." *Id.* X-rays showed "very well-preserved knees" without arthritis. *Id.* He prescribed Vicodin for pain and recommended an MRI of her knees to assess for internal derangement. *Id.*

On February 6, 2012 Douglas Ashinsky, M.D. diagnosed Plaintiff with neck pain, arthritis of the neck, insomnia, knee pain, and shoulder pain. (R. 419). A physical examination of Plaintiff revealed that her neck was "within normal limits, supple, non-tender" and had "no carotid bruit" and "no jugular venous distention." (R. 420). The physical examination of her musculoskeletal system also revealed that it was "within normal limits" with "normal range of motion, normal strength, no tenderness, no swelling, no deformity" and "normal gait." (R. 421). Dr. Ashinsky referred Plaintiff to JAG Physical Therapy for evaluation and treatment. *Id.*

On February 15, 2012, Plaintiff's initial examination at JAG Physical Therapy found that she had some reduced range of motion. (R. 433-34). Michael Wylykanowitz designed a physical therapy plan for Plaintiff that consisted of therapeutic exercises, neuromuscular rehabilitation, manual therapy, and patient education. (R. 435). Plaintiff was instructed to participate in physical therapy treatment three times per week for four weeks. A long-term goal of the physical therapy report notes that in six weeks Plaintiff "will return to all functional activities." However, Plaintiff only attended this initial evaluation, and did not attend any further physical therapy sessions at JAG Physical Therapy. (R. 561).

On May 8, 2012, Plaintiff was admitted to Overlook Hospital for syncope and seizure. (R. 442, 444). Plaintiff stated that she had been feeling "malaise, vertigo, headaches" over the two or three days prior. (R. 442). The next day, she was transferred to Morristown Memorial Hospital for cardiac catherization. (R. 495). The cardiac catherization showed "left ventricular dysfunction and segmental wall motion abnormalities and normal coronary arteries." (R. 519).

On May 10, 2012, Jay H. Curwin, M.D. recommended implementation of an implantable cardioverter defibrillator (ICD). (R. 521). This procedure followed at Morristown Medical Center on May 11, 2012 "as a secondary prevention against sudden cardiac death." (R. 550). An

ICD system was successfully implanted. (R. 552). Clifford C. Sebastian, M.D. confirmed that it was recommended Plaintiff refrain from driving or using her left arm for six months following this procedure. (R. 582). Because of these limitations, Dr. Sebastian recommended Plaintiff be placed in a temporarily disabled category. *Id.* As a follow-up to the ICD procedure, a noninvasive defibrillator testing (NIPS) was conducted in September 2012. (R. 629-72).

A September 2012 examination by Joseph Corona, M.D. of Summit Medical Group found that Plaintiff had a fifty percent restriction of neck motion and diminished sensibility at the ulnar four digits of her left hand. (R. 602). Dr. Corona gave a diagnosis of cervical syndrome with left radicular features and a tentative diagnosis of left cervical radiculopathy and spondylosis at C5-C6. *Id.*

On September 27, 2012 Harlan E. Hiramoto, M.D. examined Plaintiff and found that she was unable to bring her chin to touch her chest by two inches. (R. 612). Dr. Hiramoto noted that Plaintiff's extension, lateral bending, and rotation were at fifty percent. Further, the motor exam revealed weakness of all motor groups of the left upper extremity as compared to the right side. Plaintiff was diagnosed with chronic pain syndrome, cervical strain, degenerative joint disease, and radiculopathy. The care plan involved a recommendation for a new MRI, prescriptions for Flexeril and Percocet, an option of therapy, pain management, and possible surgery. Id.

Plaintiff underwent a further consultation with Qing Tai, M.D., Ph.D. on October 16, 2012. (R. 682). Dr. Tai's cervical spine examination demonstrated no gross deformity. Further, he found the cervical spine range of motion was "thirty percent reduced in flexion, extension, left side bending, and rotation associated with pain at the end of range of motion." Id. The right-side bending and rotation, however, was pain free. The neurological exam revealed sensation was "mildly impaired to light touch in the left hand," which was otherwise grossly intact. (R. 682-

83). Dr. Tai diagnosed left cervical radiculopathy and probable cervical disc herniation. (R. 683). He prescribed Neurontin and recommended a cervical spine CT for further evaluation.

Dr. Robert A. Kayal, M.D. examined Plaintiff on December 3, 2012. (R. 692). The physical examination he conducted revealed extremities with full and painless range of motion, a supple cervical spine, normal motor strength, normal reflexes, and normal sensory. (R. 693-94). X-rays showed advanced degenerative disc disease at C5-C6. R. 694. Dr. Kayal prescribed physical therapy, Percocet, and booster injections. (R. 695).

Plaintiff returned to Dr. Kayal on December 17, 2012 with further complaints of neck pain, numbness, and tingling in her hands. (R. 697). She returned again three days later with complaints of left knee pain and muscle spasms. (R. 702). An X-ray of her left knee revealed moderate degenerative changes, and Dr. Kayal administered an injection to her left knee and ordered a physical therapy program for her muscle spasms. (R. 705-06).

Nathalie Abi Hatem examined Plaintiff on March 7, 2013. (R. 713). The physical examination revealed neck tenderness, an abnormal range of motion for her neck due to pain of left rotation and limitation, and neck pain upon elevation of her left arm, but found no shoulder joint tenderness, no muscle weakness, and no decreased muscle tone. (R. 715). Plaintiff was again referred for physical therapy.

On April 12, 2013, Gurpreet Sidhu, M.D. examined Plaintiff for nonischemic cardiomyopathy. (R. 709-11). The physical exam reported generally normal results, such as no focal neurological deficits and no lower extremity edema. Dr. Sidhu prescribed low-dose Ramipril and carvedilol therapy.

On June 20, 2013, Plaintiff was examined by Joni Jefferson, D.O. at Zufall Health Center. R. 725-26. The examination found Plaintiff had limited extension to her neck and limited

rotation to the left. (R. 726). Dr. Jefferson diagnosed Plaintiff with cervicalgia, cervical radiculopathy, and spinal stenosis in the cervical region.  Plaintiff was prescribed Ativan for the cervicalgia and was also again referred to a rehabilitation center to see a physical therapist. Plaintiff was also referred to an orthopedic clinic for long-standing cervical stenosis and radiculopathy. *Id.*

On October 8, 2013, Plaintiff returned to Zufall Health Center and was seen by Douglas S. Bishop, M.D. (R. 727-28). Dr. Bishop diagnosed her with spinal stenosis in the cervical region, cardiomyopathy, anxiety state, and insomnia. (R. 728). For treatment of the spinal stenosis in cervical region, she was prescribed Tylenol with Codeine, and was given a new referral for physical therapy for which Dr. Bishop had a "long discussion" with her about returning to physical therapy. She was told to continue taking Lasix for the cardiomyopathy, Ativan for the anxiety, and Ambien for the insomnia.

On October 16, 2013, Plaintiff visited Atlantic Health System. (R. 733). She was provided with a plan of care that involved warm up exercise, stretching, strengthening, and similar activities. (R. 734).

On November 19, 2013, Plaintiff was treated by Dr. Jefferson again due to persistent neck pain. (R. 730-31). She was instructed to continue with the medication as previously prescribed.  (R. 731).

Consultative Examinations

Several medical professionals also examined Plaintiff on behalf of the New Jersey Division of Disability Determination Services, as part of the SSA process.

On May 23, 2012, David M. Gelber, Ph.D. conducted a psychological evaluation of Plaintiff. (R. 562). Dr. Gelber found that Plaintiff suffered from adjustment disorder with mixed

anxiety and depressed mood, but ruled out major depressive disorder and panic disorder. (R. 564). In a discussion of examples of Plaintiff's typical daily activities, Dr. Gelber stated, "she gets up, gets her daughter ready for school, stays in and rests most days . . . she is able to drive short distances . . . she sometimes does chores of dishes or clean sic bathroom . . . she does not prepare meals" and "does not shop independently.". He also noted Plaintiff "appears capable of managing personal finances independently . . . ." (R. 565).

On May 30, 2012, Christine L. Zolli, M.D. saw Plaintiff for an eye examination. Plaintiff's vision without correction was found to be 20/30 and Plaintiff was unable to see 20/20 with refraction. Plaintiff's history of optic neuritis was noted by Dr. Zolli, who recommended that SSA obtain a report from Dr. Weinberg to better assess Plaintiff's optic nerve disease. (R. 568-569).

On June 11, 2012, Rashel Potashnik, M.D. conducted an orthopedic consultative examination of Plaintiff. The examination revealed decreased cervical range of motion, possible ulnar compression neuropathy, and degenerative disease of the knees. Dr. Potashnik noted these issues "may interfere with activities requiring prolonged weight bearing activities." (R. 572-73)

In addition to these three doctors that examined Plaintiff in person, the SSA also directed three medical professionals to review Plaintiff's file and draw conclusions therefrom.

Dr. Michael Britton performed a residual functional capacity assessment by reviewing Plaintiff's records on May 25, 2012 and found Plaintiff's residual functional capacity was "light" and "non-exertional." Britton noted Plaintiff was "moderately limited" in regards to her ability to carry out detailed instructions, to maintain attention and concentration for extended periods, and to complete a normal workday and workweek without interruptions from psychologically based symptoms. (R. 80).

On July 9, 2012, Jyothsna Shastry performed a residual functional capacity assessment by examining Plaintiff's records and found Plaintiff's exertional limitations included not being able to lift or carry more than ten pounds and only being able to stand, sit, or walk for a total of six hours in an eight-hour work day. Shastry found Plaintiff could never climb ladders, ropes, or scaffolds, but could occasionally climb stairs, kneel, crouch, and crawl. Additionally, he found Plaintiff had no manipulative, visual, or communicative limitations. Finally, he noted that "range of motion of the neck/shoulder was not severely impaired." R. 79. Following from the reports by Britton and Shastry, the SSA initially denied Plaintiff's claim for disability on July 9, 2012. (R. 78-82).

In accordance with Social Security Administration procedures, Plaintiff requested that the agency reconsider the determination that she was not disabled. (R. 85). Before a reconsideration decision was made, the New Jersey Division of Disability Services requested Dr. Sebastian complete a residual functional capacity questionnaire on September 24, 2012. (R. 603). Dr. Sebastian found that Plaintiff had no limitations in regards to lifting, carrying, standing, walking, sitting, pushing, pulling, or other activities, including handling objects. Moreover, Dr. Sebastian determined there were no other conditions that limit Plaintiff's ability to do work related activities. (R. 607-608).

The SSA also had a third medical professional conduct a similar review of Plaintiff's medical file that Britton and Shastry originally had done during the initial review. Dr. Melvin Golish performed a residual functional capacity assessment by examining Plaintiff's records. Dr. Golish noted Plaintiff had exertional limitations, which included only being able to lift or carry up to ten pounds and only being able to sit, stand, or walk for six hours in an eight-hour work day. He found that Plaintiff also had postural limitations, namely that she could never climb

ladders, ropes, or scaffolds, but could occasionally perform all other postural activities.  He noted

Plaintiff had no manipulative, visual, or communicative limitations.  Finally, he noted Plaintiff's

environmental limitations included avoiding concentrated exposure of extreme cold, extreme

heat, fumes, odors, dusts, gases, poor ventilation, and similar environments, and should avoid all

exposure of hazards, such as machinery and heights.  (R. 98-99).  Based on this assessment, Dr.

Golish found Plaintiff was limited to "light" and "unskilled work." (R. 101). In accordance with

this, on February 8, 2013, the SSA denied Plaintiff's claim on reconsideration, again finding that

she was not disabled. (R. 102).

<u>Hearing Testimony</u>

On February 21, 2014, Plaintiff appeared before Richard West, ALJ and testified on her

own behalf.    Plaintiff testified that she suffered a neck injury from a car accident in 2006 and

also suffered a diagnosis of optic neuritis. (R. 36-37). She testified that she was treated for her

neck injury with injections, physical therapy, a chiropractor, and medicine.  Additionally, she

testified that the pain from her neck spreads down to her fingertips, which makes it difficult to

open things or hold items, such as a cup of tea. (R. 38-41). She also explained that her neck pain

prevents her from sitting or standing for extended periods of time, and if she lifts more than five

pounds it hurts her neck. (R. 39-41). She declined to have spinal fusion surgery. (R. 41-42).

Plaintiff further testified that she suffers from anxiety and depression. (R. 45-46).

Plaintiff emphasized that she lives in fear that there may be a problem with her heart

defibrillator. She also stated that she has panic attacks and gets dizzy spells. (R. 48-51).

Elaborating on her diagnosis of optic neuritis, she explained she gets blurry vision "mostly at

night" when she sees bright lights and if she is in the dark.  *Id.*

Following Plaintiff's testimony, the ALJ posed four hypotheticals to a vocational expert to determine if jobs exist in the economy that would be suited for Plaintiff. All hypothetical situations presented were for an individual under fifty years old, with a college education, who is able to communicate in English. The first hypothetical situation posed to the vocational expert was an individual limited to sedentary exertional work, who could not climb ladders, ropes, or scaffolds, could perform other postural functions occasionally, could frequently handle and finger bilaterally, must avoid concentrated exposure to extreme cold, extreme heat, dust, fumes, and similar occupational irritants, would not be able to work in the presence of ordinary workplace hazards, and can understand, remember, and carry out only simple tasks on a sustained basis. (R. 59). The vocational expert testified that the jobs of address clerk, document preparer, and charge account clerk could be performed by persons that fit the first hypothetical. (R. 60; *See also*, R. 22). The vocational expert identified the number of jobs in the national economy that there are for address clerk and document preparer, but did not identify the number of jobs there are for charge account clerk. (R. 60; *See also*, R. 22).

The second hypothetical posed noted the same restrictions as the first hypothetical, except the individual could only occasionally handle and finger. (R. 60-61). The vocational expert found that there would be no jobs available to such an individual.

The third hypothetical posed noted the same restrictions as the first hypothetical, except due to reductions in concentration and pain symptoms, the individual would not be able to perform such work for more than six hours in a normal eight-hour workday, and would have to be at rest for off-task periods of two hours during the eight-hour workday. *Id.* The vocational expert found that there would be no jobs available to such an individual. *Id.* However, there is no evidence in the record to support a finding that Plaintiff could not work for more than six hours

in a normal eight-hour work day or that Plaintiff would have to be at rest for off-task periods of two hours during the eight-hour workday. Instead, the residual functional capacity reports suggest Plaintiff could complete eight hours of work through a combination of sitting and standing and/or walking. (R. 78, 97).

The fourth hypothetical posed noted the same restrictions as the first hypothetical, except in order to be able to sustain employment, the individual would require a minimum of two absences per month. (R. 60-61). The vocational expert found that there would be no jobs available to such an individual. However, there is no evidence in the record to suggest that Plaintiff would require a minimum of two absences per month. *Id.*

## II.

On June 17, 2014, the ALJ issued a decision that Plaintiff was not disabled under sections 216(i) and 223(d) of the Social Security Act. (R. 23, 36). On September 18, 2015, Plaintiff's appeal of the ALJ's decision was denied by the Appeals Council of the SSA. Following from this, Plaintiff now appeals to this Article III Court for judicial review of the SSA's actions, namely the decision of the ALJ affirming the SSA's decision to deny Plaintiff disability benefits.

In making his decision that Plaintiff was not disabled, the ALJ followed the five-step sequential process for determining disability. Under step one, the ALJ found Plaintiff has not engaged in substantial gainful activity since September 15, 2010, the alleged onset date. At step two, the ALJ found Plaintiff has severe impairments, which include cervical radiculopathy, optic neuritis, non-ischemic cardiomyopathy status post implantable cardioverter defibrillator (ICD) placement, anxiety, and depression. At step three, the ALJ determined that these impairments did not meet any listing, but in combination they were severe. (R. 14). At step four, the ALJ found Plaintiff was unable to perform any of her past relevant work as a tennis instructor and

recreation manager. (R. 21); *See also* (R. 36). As a result of these findings, this case turned on the ALJ's determination under step five. At step five, the ALJ, relying on the vocational expert's testimony, found there are two or three jobs that exist in significant numbers in the national economy that Plaintiff can perform: address clerk, document preparer, and, possibly, charge account clerk. (R. 22).

III.

A claimant is considered disabled under the Social Security Act if he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which "has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). A plaintiff will not be considered disabled unless he cannot perform his previous work and is unable, in light of his age, education, and work experience, to engage in any other form of substantial gainful activity existing in the national economy. 42 U.S.C. § 423(d)(2)(A); see *Sykes v. Apfel*, 228 F.3d. 259, 262 (3d Cir. 2000); *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 118 (3d Cir. 2000); *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999). The Act requires an individualized determination of each plaintiff's disability based on evidence adduced at a hearing. *Sykes*, 228 F.3d at 262 (citing *Heckler v. Campbell*, 461 U.S. 458, 467 (1983)); see 42 U.S.C. § 405(b). The Act also grants authority to the Social Security Administration to enact regulations implementing these provisions. See *Heckler*, 461 U.S. at 466; *Sykes*, 228 F. 3d at 262.

Review of the Commissioner's final decision is limited to determining whether the findings and decision are supported by substantial evidence in the record. 42 U.S.C. § 405(g). See *Morales v. Apfel*, 225 F.3d 310, 316 (3d Cir. 2000); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). *Doak*, 790 F.2d 26 at 28. Substantial evidence has been defined as "such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Hartranft*, 181 F.3d at 360 (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citation omitted)); see also Richardson v. Perales, 402 U.S. 389, 401 (1971). Substantial evidence is less than a preponderance of the evidence, but more than a mere scintilla. *Richardson*, 402 U.S. at 401; *Morales*, 225 F.3d at 316; *Plummer,* 186 F.3d at 422. Likewise, the ALJ's decision is not supported by substantial evidence where there is "competent evidence" to support the alternative and the ALJ does not "explicitly explain all the evidence" or "adequately explain his reasons for rejecting or discrediting competent evidence." *Sykes*, 228 F.3d at 266 n.9.

The reviewing court must view the evidence in its totality. Daring v. Heckler, 727 F.2d 64, 70 (3d Cir. 1984). A single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence B particularly certain types of evidence (e.g., that offered by treating physicians) - - or if it really constitutes not evidence but mere conclusion. *Morales*, 225 F.3d at 316 (citing *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir.1983)); see also *Benton v. Bowen*, 820 F.2d 85, 88 (3d Cir. 1987). Nevertheless, the district court's review is deferential to the ALJ's factual determinations. *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992) (en banc) (stating district court is not "empowered to weigh the evidence or substitute its conclusions for those of the factfinder"). A reviewing court will not set a Commissioner's decision aside even if it "would have decided the factual inquiry differently." *Hartranft*, 181 F.3d at 360. But despite the deference due the Commissioner, "appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]' s decision is not supported by substantial evidence." *Morales*, 225 F.3d at 316 (quoting *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981)).

Title II of the Social Security Act, 42 U.S.C. § 401, et seq. requires that the claimant provide objective medical evidence to substantiate and prove his or her claim of disability. See 20 CFR § 404.1529. Therefore, claimant must prove that his or her impairment is medically determinable and cannot be deemed disabled merely by subjective complaints such as pain. "A claimant's symptoms such as pain, fatigue, shortness of breath, weakness, or nervousness, will not be found to affect . . . .[one's] ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment(s) is present." 20 C.F.R. § 404.1529(b); *Hartranft*, 181 F.3d at 362. In *Hartranft*, claimant's argument that the ALJ failed to consider his subjective findings were rejected where the ALJ made findings that claimant's claims of pain and other subjective symptoms were not consistent with the objective medical records found in the record or the claimant's own hearing testimony.

IV.

Plaintiff's counsel argues that the ALJ erred in two ways. First, that the ALJ improperly discounted Plaintiff's subjective complaints (Pl. Br. 11). Second, Plaintiff cannot perform the jobs identified by the vocational expert. (Pl. Br. 13).

Although Plaintiff's initial application with the SSA claimed disability because of several injuries or diseases, Plaintiff does not challenge the ALJ's findings as to her mental health or heart issues. Therefore, the following analysis focuses on Plaintiff's complaints of radiculopathy to her arms and hands and her impaired vision.

Plaintiff's first argument is that the ALJ's finding that Plaintiff could use her hands for "frequent" handling and fingering is not supported by substantial evidence. Plaintiff instead argues that the evidence supports a more restrictive capacity for handling and fingering that would preclude sedentary jobs. Following from that assertion, Plaintiff's second argument is

that Plaintiff is limited to occasional handling and fingering, and therefore there are no jobs available to her according to the testimony of the vocational expert. Plaintiff also attacks the three jobs identified by the ALJ for varying reasons. First, Plaintiff questions whether the job of address clerk exists in substantial numbers. Second, Plaintiff alleges the job of document preparer is not available to her because it requires frequent eye use, which she is unable to do because of her optic neuritis and other eye impairments. Finally, Plaintiff argues that the vocational expert did not identify the potential number of positions in the economy for the job of charge account clerk and, therefore, this job also cannot be considered an option.

Plaintiff's first argument is without merit because the ALJ properly considered Plaintiff's subjective complaints, but substantial evidence existed on the record to justify the ALJ's finding that Plaintiff is not disabled

Plaintiff's argument challenges the ALJ's findings relating to her complaints of radiculopathy to her arms and hands. However, Plaintiff relies heavily on medical evidence from the time period prior to her application, whereas, the ALJ relied on more recent evidence pertaining to the relevant time period.

For example, Plaintiff cites six times that she complained of numbness and tingling to her fingertips. Four of these medical visits occurred prior to her filing for Social Security Disability and therefore were not given great weight by the ALJ. *(See* R. 298, 334, 357, 359). Plaintiff also points to a 2006 diagnosis of disc herniation and radiculopathy, and 2007 findings that her right hand had decreased grip strength. Likewise, this evidence was not given great weight, as these medical visits occurred several years prior to Plaintiff's claimed disability onset date. Within the relevant time period, Plaintiff points to two medical records in which she complained of numbness and tingling. *(See* R. 612, 692). Plaintiff also cites her own testimony in front of the

ALJ as support for this argument. Plaintiff points to the fact that she stated her hand would feel numb, cold, and wet, and that this made it difficult to open things and caused her to drop a cup once. (R. 38, 40-41, 43). Plaintiff also cites a visit with Dr. Potashnik in June of 2012 stating, "Dr. Potashnik confirmed findings of diminished ulnar nerve function . . . ." Although Dr. Potashnik conducted an examination involving Plaintiff's ulnar nerve function, a review of the record indicates that Dr. Potashnik's ultimate impression only stated "possible ulnar compression neuropathy," suggesting that this diagnosis was not even confirmed. (R. 573).

The ALJ recognized that the medical record reflected a herniated disc in the cervical spine with intermittent numbness, tingling, and slightly reduced motor strength in the left upper extremity. (R. 20). However, the ALJ noted that "recent physical exams showed some reduced range of motion in the cervical spine but were otherwise within normal limits." (R. 20; *See, e.g.*, R. 420, 693-94).

Plaintiff also argues that her testimony is entitled to great weight. The ALJ must give "great weight" to a plaintiff's subjective testimony when it is supported by competent medical evidence. *See Schaudeck v. Comm'r of SSA, 181 F.3d 429, 433 (3d Cir. 1999) (citing Dobrowolsky v. Califano*, 606 F. 2d 403, 409 (3d Cir. 1979)); *See also* Pl. Br. 12. However, the ALJ gave limited weight to a majority of the medical evidence that Plaintiff relies because it was from the time period prior to her alleged disability onset or did not include a definite diagnosis. As explained above, Plaintiff's only supporting evidence is self-reported numbness and tingling, diagnoses of disc herniation, radiculopathy, and decreased grip strength years before her disability onset, first person testimony in front of the ALJ, and one possible diagnosis of diminished ulnar nerve function.

The directive from the Third Circuit orders ALJs to give great weight to a Plaintiff's subjective testimony only when it can be corroborated by objective evidence. In the case at bar, the ALJ explained that the more recent objective medical evidence does not corroborate Plaintiff's subjective testimony as to the intensity, persistence, or limiting effects of her injuries. Therefore, Plaintiff's argument that the ALJ must give Plaintiff's testimony great weight is without merit as there is substantial evidence in the record to support the ALJ's finding that more recent medical evidence does not support Plaintiff's claims.

Plaintiff has the burden to present medical findings that show his or her impairment matches a listing or is equal in severity to a listed impairment. See *Burnett v. Commissioner of Social Security*, 220 F.3d 112, 120, n.2 (3d Cir. 2000).   In evaluating symptoms, including pain, the ALJ considers all symptoms, including pain, and the extent to which Plaintiff's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence First, the plaintiff must provide medical evidence showing a medical impairment that could reasonably be expected to produce the alleged symptoms. 20 C.F.R. § 404.1529(b). Second, once the plaintiff has proven a physical or mental impairment through objective medical evidence, the ALJ must evaluate the intensity, persistence, and limiting effects of the plaintiff's symptoms to determine if they could produce the alleged symptoms. 20 C.F.R. § 404.1529(c). Therefore, in order to make his final decision, the ALJ considered all symptoms the plaintiff alleged and accepted those that were reasonably consistent with the objective medical evidence, as required by the SSA. 20 C.F.R. § 404.1529.

Under the first step of this credibility assessment, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms. (R. 20).

However, under the second step, the ALJ found that Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were "not entirely credible." Id.

Supporting this conclusion, the ALJ pointed to Plaintiff's self-reported physical abilities and the objective medical evidence. (R. 20). First, the ALJ noted that, by Plaintiff's own account, the only personal need she is unable to perform completely independently is fixing her hair. Id.; *See also* (R. 220). In addition, the ALJ relied on the fact that Plaintiff stated she is able to prepare light meals, do light household chores, drive, take her daughter to school, play with her daughter, help her with homework, attend her daughter's activities, and use the computer. (R. 20; *See also* R. 219-26).

Here, the ALJ relied on objective evidence found in the record. Explaining why he did not give greater weight to Plaintiff's subjective evidence, the ALJ stated, "the claimant's subjective reported history cannot substitute for the objective medical evidence contained in the record, which provides a more accurate longitudinal history of the claimant's conditions." (R. 20; *See also* 20 C.F.R. § 404.1529(c)(2)).

The ALJ notes that the record reflects a herniated disc in the cervical spine with intermittent numbness, tingling, and slightly reduced motor strength in the left upper extremity. R. 20. According to the recent physical exams, the herniated disc reduced the range of motion in the cervical spine, but it was otherwise within normal limits. *Id*. For example, Dr. Jefferson noted Plaintiff's neck had limited extension and limited rotation, but did not mention anything about a restricted ability for Plaintiff's use of her hands. (R. 726).

Additionally, the ALJ's discussion of the record highlights several doctors who addressed Plaintiff's claims of hand and finger pain. For example, Dr. Tai's found Plaintiff was "mildly impaired to light touch in the left hand," but her "motor, muscle strength is 5/5 in four

extremities." (R. 682-83; *See also* R. 18).  In addition, the ALJ afforded great weight to Dr.

Sebastian's residual functional capacity report of Plaintiff. The ALJ noted that, prior to his

completion of this report, Dr. Sebastian had recommended Plaintiff be placed in a temporarily

disabled category until she was able to drive and use her left arm again. (R. 19). Nonetheless,

when completing this form at a later date, Dr. Sebastian felt that Plaintiff now had no limitations

with regard to working. *Id*.

The ALJ also took into account doctors that noted Plaintiff's injuries may demand job

limitations. (R. 19). For example, Dr. Potashnik noted that Plaintiff's injuries "may interfere with

activities requiring prolonged weight bearing activities." (R. 573). The ALJ noted that these

opinions influenced his decision to limit the claimant to sedentary work. (R. 19).   Nonetheless,

the Code of Federal Regulations states that the SSA "will not reject claimant's statements about

the intensity and persistence of claimant's pain or other symptoms about the effect claimant's

symptoms have on claimant's ability to work solely because the available objective medical

evidence does not substantiate claimant's statements." 20 C.F.R. § 404.1529(c)(2). However, in

this case, because the ALJ relied on objective medical evidence as well as contradictory

subjective evidence from Plaintiff, he did not violate this requirement.

The facts of this case parallel a case in which the Third Circuit affirmed an ALJ's

decision that the Plaintiff was not entitled to disability benefits. *Hartranft v. Apfel*, 181 F.3d 358,

359 (3d Circ. 1999). In *Hartranft,* the plaintiff's argument that the ALJ failed to consider

subjective evidence was rejected because the ALJ made findings that the plaintiff's claims of

pain and other subjective symptoms were not consistent with the objective medical records or the

plaintiff's own testimony in the record. *Id.* at 362. Similarly, in the case at bar, the ALJ found

Plaintiff's claims were not credible in light of the objective medical evidence and subjective

claims she had made. (R. 20-2)1. Because there is substantial evidence in the record supporting the ALJ's conclusion, his decision should be affirmed.

Alternatively, the Code of Federal Regulations notes there are "certain limited situations when your disability can be found to have ended even though medical improvement has not occurred." 20 C.F.R. § 404.1594(d). One of these situations is if someone claiming entitlement to disability benefits was prescribed treatment in order to restore his or her ability to work, he or she must comply with the prescribed treatment in order to qualify for disability. 20 C.F.R. § 404.1594(e)(4).

In the case at bar, Defendant points out that Plaintiff did not comply with several prescribed treatments. Dr. Corona noted that Plaintiff declined to undergo surgery that another doctor had recommended in order to cure her neck pain. (R. 602; *See also* R. 41-42).

Furthermore, on multiple occasions, Plaintiff did not follow through with the recommendation to undergo physical therapy. First, in early 2012, Dr. Ashinsky ordered Plaintiff to engage in physical therapy and referred her to JAG Physical Therapy. (R. 421). Plaintiff attended an initial evaluation at JAG Physical Therapy and received a plan that predicted she could "return to all functional activities" in six weeks. (R. 435). Despite this optimistic outlook, Plaintiff failed to return to JAG Physical Therapy ever again. (R. 561). In addition, multiple other doctors prescribed Plaintiff enter physical therapy to treat her neck pain, but there is no evidence that she ever complied with these orders. (*See, e.g.*, R. 695). For example, on December 3, 2012, Plaintiff complained of neck pain and Dr. Kayal prescribed physical therapy. (R. 706). On December 20, 2012, Dr. Kayal prescribed further physical therapy for Plaintiff's muscle spasms. (R. 715). On March 7, 2013, Plaintiff was prescribed physical therapy again for neck pain. (R. 726) On July 8 2013, Dr. Jefferson referred her to a rehabilitation center and

recommended physical therapy two to three times per week for eight weeks. (R. 728). On October 8, 2013, Dr. Bishop prescribed physical therapy and further noted, "Long discussion with patient. She should get back into PT—new referral given.".

The Social Security Rulings note that a Plaintiff's failure to comply with prescribed treatment can affect an ALJ's assessment of his or her credibility. *Titles II & XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements*, SSR 96-97P, 1996 WL 374186 (S.S.A. 1996) at *7 ("The individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure."). Accordingly, the fact that Plaintiff failed to comply with prescribed physical therapy recommendations also lends support to the ALJ's assessment of Plaintiff's credibility and the weight given to her subjective evidence.

Plaintiff's next argument is that the vocational expert should not have found that Plaintiff could perform frequent handling and fingering; and, if Plaintiff were limited to occasional handling and fingering, the vocational expert stated that there would be no jobs available to Plaintiff. (R. 60-61). However, for the reasons discussed above, this argument fails because there is substantial evidence found in the objective medical evidence and subjective evidence supporting the fact that Plaintiff can perform frequent handling and fingering.

Plaintiff's argument then attacks each of the three jobs identified by the vocational expert. (*See* Pl. Br. 13-14). Plaintiff argues that the first job identified by the vocational expert, address clerk, does not exist in substantial numbers. As support for this argument, Plaintiff cites a SSA presentation in which SSA researchers stated that it is doubtful the job of addresser currently exists in significant numbers in the economy. First, it is worth noting that the

vocational expert identified the job of "address clerk" whereas the study cited by plaintiff discusses "addresser." (*Compare* R. 60, *with* Pl. Br., Exhibit A 7). It is unclear whether the two terms are synonymous, but it is reasonably plausible that they are because this argument is not raised by the Defendant.

Second, the Defendant points out that that this study was not conducted by vocational experts and is not authoritative. Instead, the regulations allow the SSA to utilize the services of vocational experts, as the ALJ did in this case. (20 C.F.R. § 404.1566(e)). The Third Circuit has recognized the need to use vocational experts during step five of the ALJ's analysis due to the fact-specific nature of the inquiry. *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 126 (3d Cir. 2000). In the case at bar, Plaintiff's attorney stipulated to the vocational expert's qualifications to testify. (R. 58). Furthermore, the vocational expert did not solely rely on her own credentials, but instead also used the Dictionary of Occupational Titles in supporting her answers. (R. 59). In fact, the ALJ determined that the vocational expert's testimony was consistent with the information in the Dictionary of Occupational Titles. (R. 22). Therefore, Plaintiff's argument that the job of address clerk does not exist in significant numbers is solely speculation and does not have merit because, according to the Code of Federal Regulations, the ALJ was allowed to rely on the testimony of the vocational expert in making his decision.

Plaintiff then argues that the second job identified by the vocational expert, document preparer, is not an option for Plaintiff because it would require her to use her eyes for frequent acuity. Plaintiff contends she is unable to perform this job function because of her eye impairments and limitations. Id. Although she was diagnosed with optic nerve damage in 2007, these medical records were not given great weight by the ALJ because they are from the time period prior to her alleged disability onset date. Instead, the ALJ gave greater weight to the more

recent examination conducted by Dr. Zolli. (R. 568-69). Dr. Zolli's report noted Plaintiff's vision was 20/30, and an examination of the back of the eye revealed that optic nerve heads appeared mildly translucent, but no gross optic atrophy was noted. Id.

Although the ALJ found that Plaintiff's optic neuritis was a severe impairment, there is substantial evidence that suggests Plaintiff's contention that her eye condition is so severe as to prevent her from working is not credible. First, the ALJ noted that the activities she testified that she engages in, such as driving, helping with homework, and using the computer, do not align with someone who has severe eyesight problems. (R. 20). Second, Defendant points out that, according to Plaintiff's own testimony, her blurry vision occurs "mostly at night, when I see, like, bright lights and if I'm in the dark." (*See* R. 50). Because the job of document preparer does not involve working in the dark or with bright lights, Plaintiff's concerns are without merit. (*See* Dictionary of Occupational Titles, DICOT 249.587-018). Finally, the medical records cited above state that Plaintiff's vision is not perfect, but do not suggest her eye issues are at the drastic level Plaintiff alleges. For example, Dr. Zolli's report, created for the Division of Disability Determination Services, does not note that Plaintiff's eye condition is of a severe enough caliber to prevent her from performing any daily activities or work functions. For these reasons, Plaintiff's concerns regarding this job are without merit.

Finally, Plaintiff's last argument is that the job of charge account clerk may not be available to Plaintiff because the vocational expert did not note how many jobs exist nationally for this job. However, this argument is erroneous because the ALJ made his final conclusion without considering the job of charge account clerk since it was not determined if the job exists in significant numbers. R. 22. The ALJ only needs to identify one job that an individual can perform. (20 C.F.R. § 404.1566(b); *See also Wright v. Sullivan*, 900 F.2d 675, 679 (3d Cir.

1990)) (holding the Commissioner only must identify one occupation in the national economy that plaintiff can perform). Because the ALJ did not rely on the job of charge account clerk in making his final decision, this argument is irrelevant.

Review of the Commissioner's final decision is limited to determining whether the findings and decision are supported by substantial evidence in the record. 42 U.S.C. § 405(g). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hartranft v. Apfel*, 181 F.3d at 360 (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citation omitted)). Nonetheless, substantial evidence means "more than a scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). To pass substantial evidence review, if faced with conflicting evidence, the ALJ "must adequately explain in the record his reasons for rejecting or discrediting competent evidence." *Benton v. Bowen*, 820 F.2d 85, 88 (3d Cir. 1987) (citing *Brewster v. Heckler*, 786 F.2d 581 (3d Cir. 1986)). Further, the ALJ must view all evidence, including medical evidence and the testimony of the vocational expert, in its totality. *Daring v. Heckler*, 727 F.2d 64, 70 (3d Cir. 1984). As a result, this Court may reverse the ALJ and SSA's decision to deny Plaintiff disability benefits only if the evidence compels reversal, not merely because the evidence supports a contrary decision. *See INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992).

In addition, the Third Circuit has stated that in determining whether there is substantial evidence to support an ALJ's decision, a reviewing court "owes deference to the ALJ's evaluation of the evidence, assessment of the credibility of witnesses, and reconciliation of conflicting expert opinions." *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 506 (3d Cir. 2009).

For the reasons set forth above, the ALJ decision in this matter is based on the substantial evidence of the record, and is therefore affirmed.

## ORDER

This matter having come before the Court on review of a final administrative determination of the Commissioner of the Social Security Administration denying Plaintiff's application for Social Security Disability benefits under Title II of the Social Security Act; and the Court having considered the submissions of the parties, for the reasons set forth above;

It is, on this 10TH day of July, 2017;

ORDERED that the final decision of the Commissioner of Social Security is affirmed. The case is closed.

*s/Peter G. Sheridan*
PETER G. SHERIDAN, U.S.D.J.